Filed 12/16/15; pub. order 1/15/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHRISTIAN THORSEN NOERGAARD, | |
| Plaintiff and Respondent, | G049854 |
| v. | (Super. Ct. No. 14FL000022) |
| TAMMY NOERGAARD, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Linda Lancet Miller, Judge. Reversed and remanded.

Tammy Noergaard, in pro. per; and Merritt McKeon for Defendant and Appellant.

American Overseas Domestic Violence Center and Voices Set Free—Intercept Abuse as Amici Curiae on behalf of Defendant and Appellant.

Family Violence Appellate Project, Nancy K.D. Lemon, Jennafer Dorfman Wagner, and Shuray Ghorishi; O'Melveny & Myers, Sharon M. Bunzel, Ward A.

Penfold, Gabriel Markoff, Brian Y. Chang, and Yahor Frusevich as Amicus Curiae on behalf of Defendant and Appellant.

Ruben/Huggins, Stephen B. Ruben and Diana L. Leonida for Plaintiff and Respondent.

\*            \*            \*

To combat the harmful effects of international child kidnapping, the Hague Convention on the Civil Aspects of International Child Abduction (Convention or Hague Convention) requires the judicial or administrative authorities of a signatory nation (i.e., a "Contracting State") to order a child returned to her country of habitual residence if the child has been wrongfully removed to or retained in the Contracting State.[1] The International Child Abduction Remedies Act (ICARA) implements the Convention in the United States, granting federal and state courts concurrent jurisdiction and directing those courts to decide cases under the Convention. (42 U.S.C. § 11601 et seq.)

Here, the trial court granted Christian Noergaard's request to remove his 11-year-old daughter from the care of her mother Tammy Noergaard and return the child to Denmark without an evidentiary hearing on critical aspects of Tammy's objections under the Hague Convention.[2] The trial court declined to address mother's allegations father e-mailed a death threat against her and Mia's younger sister or her exhibits and testimony supporting her claim he engaged in a history of spousal abuse and child abuse. According to mother, father's abuse caused Mia to run away from his care in Denmark and flee to Orange County with her maternal grandmother.

---

[1]     See generally Hague Convention, October 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 49 (reprinted at 51 Fed.Reg. 10494 (Mar. 26, 1986)). We take judicial notice of the Convention. (Evid.Code, § 452, subd. (c).)

[2]     We use the family members' first names or their familial status (e.g., mother or father) for clarity. (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

2

Because due process requires an opportunity for mother to be heard on claims that would prevent Mia's return under the Hague Convention, we reverse the judgment and remand for a full evidentiary hearing.

I

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Proceedings in Orange County*

In late January 2014, Orange County Sheriff's Department deputies found Mia with mother in Orange County, where they had lived together with father and Mia's younger sister before the family departed for Germany. The deputies removed Mia from mother's care based on father's ex parte custody demand in his Hague petition filed in the superior court. According to mother, although Mia was transported to Orangewood based on Mia's refusal to return to father, Orange County Social Service Agency (SSA) social workers conducted only a cursory investigation and summarily released Mia to father's sole custody despite her and Mia's allegations father engaged in a pattern of domestic violence. According to mother, father's abuse began when he lost his job in Germany and unilaterally took the children to Denmark. Mother also alleged father issued death threats against them and asked SSA to delay handing Mia over to father while she sought proof of her abuse allegations in documentation from Denmark. SSA, however, refused her request and relinquished custody of Mia to father.

The trial court denied mother's repeated requests for an Evidence Code section 730 psychological evaluation of Mia and, according to mother, conducted a summary trial that violated her right to due process. The court admitted into evidence only two documents among the parties' voluminous exhibit binders: two Danish court orders in 2012 vesting custody of Mia and her sister with father. The trial court declined to resolve whether father sent mother an e-mail in July 2013 containing death threats against mother and Mia's sister. The court concluded it lacked the technical expertise to determine the e-mail's authenticity. The court reviewed competing declarations from

3

father and mother and their respective technology experts.  But the court denied mother's repeated requests to testify and call other witnesses to support her abuse claims, including lay and expert witnesses.  In prohibiting witness testimony, the court also declined to allow mother to cross-examine father.  Nor would the court consider mother's supporting documentation and exhibits concerning the e-mail, her allegations of abuse, or other related subjects, such as the Denmark custody proceedings or a European Union investigation concerning the alleged failure of Danish courts to take allegations of domestic violence seriously when brought by a non-Danish parent.

The court interviewed Mia in-camera with minor's counsel present, but not mother or father or their counsel.  Based on its brief interview with Mia, the court concluded Mia did not fear father, had not run away from him, and implicitly determined mother's abuse allegations were unfounded or that the Danish courts had, or would, resolve those claims against her.  The court rejected mother's renewed request for a psychological exam to explain Mia's seeming recantation in her in-camera interview, and declined to hear mother or her witnesses' contrary testimony alleging abuse.  The trial court granted father's Hague petition and returned his and Mia's passports for them to board a plane to Denmark that night.

II

DISCUSSION

Mother contends the trial court erred in granting father's petition to return Mia to Denmark in his care without an evidentiary hearing on crucial aspects of her claims of spousal abuse and child abuse, including recent death threats.  We agree mother's claims must be addressed in a full evidentiary hearing.

A.    *Governing Law and Standard of Review*

The Hague Convention does not mandate a child's automatic return to a parent in another country, but instead protects children against "the *harmful* effects of

4

their wrongful removal or retention" across international borders. (Convention, preamble, italics added.) Where appropriate, the Convention establishes "procedures to ensure their prompt return to the State of their habitual residence." (*Ibid.*; see *Blondin v. Dubois* (2d Cir. 2001) 238 F.3d 153, 155 (*Blondin*).) But a speedy return "'is not the goal in cases where there is evidence that the status quo was abusive.'" (*Van De Sande v. Van De Sande* (7th Cir. 2005) 431 F.3d 567, 572 (*Van De Sande*).)

As father did here, a parent seeking a child's return under the Convention may initiate a civil action in the jurisdiction where the child is physically located. (42 U.S.C. § 11603(b); all further statutory references are to this code and title unless noted.) The petitioner must establish by a preponderance of evidence the child's country of habitual residence and that another person wrongfully removed or retained the child outside that country. (§ 11603(e)(1)(A).) The removal or retention of a child is wrongful when it interferes with the petitioning parent's custody rights in the country of habitual residence. (Convention, art. 3; see, e.g., *Sealed Appellant v. Sealed Appellee* (5th Cir. 2004) 394 F.3d 338, 343 (*Sealed Appellant*).)

If the petitioning party meets his or her burden to establish the child's country of habitual residence and wrongful removal or retention, the respondent nevertheless may prevent the return of the child or require certain conditions or "undertakings" on the child's return based on several affirmative defenses. (Convention, arts. 12, 13, 20; see, e.g., *Van De Sande*, *supra*, 431 F.3d 567, 571-572 [overturning order for return of children where district court's limited inquiry and undertakings ignored father's extensive history of abuse].) For example, return is precluded under the Convention if the respondent shows by a preponderance of evidence that the petitioner was not exercising his or her custody rights, or a child of adequate age and maturity objects to returning. (Convention, arts. 12, 13(a); § 11603(e)(2)(B).)

Other affirmative defenses include a showing by clear and convincing evidence that returning the child would violate the child's or other parent's human rights

or fundamental freedoms, or the return would cause grave risk to the child's mental or physical well-being.  (Convention, arts. 20, 13(b); § 11603(e)(2)(A); *Sealed Appellant*, *supra*, 394 F.3d at p. 343.)  Domestic violence or child abuse constitutes a grave risk to the child.  As one court observed in overturning a return order obtained without an evidentiary hearing, "given [father's] propensity for violence . . . and the grotesque disregard for the children's welfare that he displayed by beating his wife severely and repeatedly in their presence and hurling obscene epithets at her also in their presence, it would be irresponsible to think the risk to the children less than grave."  (*Van De Sande*, *supra*, 431 F.3d at p. 570; see also *Walsh v. Walsh* (1st Cir. 2000) 221 F.3d 204, 220 (*Walsh*) ["grave risk" established by evidence of petitioner's violence in children's presence, noting research that serial spousal abusers are more likely to strike children and children face increased risk of psychological harm].)

Family Code section 3044 reflects similar concern for children in abusive homes, establishing in trial court proceedings "a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child . . . ."  True, the Hague standard is narrower than the "best interests of the child" in a custody proceeding; for example, it is not enough that the child would have better prospects in one country or another, nor is general political or social unrest sufficient to prevent the child's return.  (*Danaipour v. McClarey* (1st Cir. 2002) 286 F.3d 1, 14 (*Danaipour*); England *v. England* (5th Cir. 2000) 234 F.3d 268, 271; *Nunez-Escudero v. Tice-Menley* (8th Cir. 1995) 58 F.3d 374, 378; *Frier v. Frier* (E.D. Mich. 1996) 969 F.Supp. 436; *Janakakis-Kostun* (Ky. App. 1999) 6 S.W.3d 843; *Tahan v. Duquette* (N.J. Super. Ct. App. Div. 1992) 613 A.2d 486, 488.)

But psychological, sexual, or physical harm of a spouse or child poses a grave risk precluding a child's return.  (*Danaipour*, *supra*, 286 F.3d at p. 16; *Blondin*, *supra*, 238 F.3d at p. 155; *Rodriguez v. Rodriguez* (D. Md. 1999) 33 F.Supp.2d 456;

6

*Steffen F. V. Severina P.* (Dist. Ariz. 1997) 966 F.Supp. 922.) A pattern of violence in the home may not be ignored. (*Walsh*, *supra*, 221 F.3d at 219.) "Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected." (*Van De Sande*, *supra*, 431 F.3d at p. 571.) Accordingly, "[t]he rendering court [considering a Hague petition] must satisfy itself that the children will in fact, and not just in legal theory, be protected if returned . . . ." (*Id.* at pp. 581-572 [noting that "in cases of child abuse the balance may shift against return [even with] conditions"].)

We review issues of law in Hague proceedings de novo. (*Croll v. Croll* (2d Cir. 2000) 229 F.3d 133, 136.) A trial court's factual determinations "are reviewed for clear error," but the lower court's "*application* of the Convention to the facts it has found, like the *interpretation* of the Convention, is subject to de novo review." (*Blondin*, *supra*, 238 F.3d at p. 158, original italics.)

B.      *The Trial Court Erred in Failing to Determine the Authenticity of Father's Alleged Death Threat*

Here, among other objections, mother opposed father's Hague petition on grounds of grave risk (Convention, art. 13(b)) if Mia were returned to Denmark and father's care. Mother alleged father engaged in an extensive history of domestic violence against her and the children, including death threats in a recent e-mail. Father disputed the authenticity of the e-mail. Unfortunately, the trial court declined to hold an evidentiary hearing on the e-mail, explaining that it doubted it would be able to determine its authenticity. The trial court reviewed mother's and father's declarations on the issue and those of their respective technology experts. But the court did not permit the parties or their experts to testify, apparently concluding the unheard testimony was beyond the court's expertise ("The court will not be able to make a finding" on the e-mail). The court concluded simply that "neither [side] can prove it was an original, or came from Dad, or that it wasn't an e-mail that originated from Dad."

7

The court's decision *not* to decide the issue of death threats is puzzling in two respects. First, it is the trier of fact's role to resolve even the most complex issues of disputed material fact. (See, e.g., *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851 (*Aguilar*).) As Judge Posner has observed, "the judge can't just throw up his hands, as happened in this case, because he can't figure out what is true and what is false . . . ." (*Khan v. Fatima* (7th Cir. 2012) 680 F.3d 781, 785 (*Khan*) [reversing Hague Convention return order for full evidentiary hearing].) Death threats are patently material to the grave risk analysis, and therefore the trial court erred by leaving the matter undecided. (See *Van De Sande,supra*, 431 F.3d at p. 570 [reversing return of child for full evidentiary hearing where trial court "inexplicably gave no weight to [the father's alleged] threat to kill the children"].) Second, testimony can illuminate seemingly intractable factual issues, and therefore the trial court erred in deciding to neither hear testimony nor resolve the issue.

The trial court's decision to simply ignore and leave unresolved father's alleged death threats is similar to the due process abdication in *In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281 (*Carlsson*). There, the trial judge refused to allow the husband's attorney to finish his evidentiary presentation and abruptly ended the trial by walking off the bench. The effect here in failing to admit or hear evidence to resolve the death threat allegations is the same: "summary termination of the trial infring[ing] on [the] fundamental right to a full and fair hearing." (*Id.* at p. 291.)

In *Carlsson*, the wife on appeal defended the judgment on grounds "there is no such thing as 'structural error' in a civil case." (*Carlsson*, *supra*, 163 Cal.App.4th at p. 292.) But the court explained that the "structural error" label was not dispositive; rather, "'Denying a party the right to testify or to offer evidence is reversible per se.' [Citations.] As the state Supreme Court has recently stated: '"We are fully cognizant of the press of business presented to the judge who presides over the [Family Law] Department of the Superior Court . . . , and highly commend his efforts to expedite the

8

handling of matters which come before him.  However, such efforts should never be directed in such manner as to prevent a full and fair opportunity to the parties *to present all competent, relevant, and material evidence* bearing upon any issue properly presented for determination.  [¶]  Matters of domestic relations are of the utmost importance to the parties involved and also to the people of the State of California. . . .  To this end a trial judge should not determine any issue that is presented for his consideration until he has heard all competent, material, and relevant evidence the parties desire to introduce.'"  [Citation.]"  (*Id.* at p. 291, original italics.)

The *Carlsson* court explained that though the then-recent Supreme Court case in *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 (*Elkins*) "involved a different issue than that posed here — whether a local rule that required parties to present their case in contested dissolution trials by means of written declarations was inconsistent with certain statutory provisions [citation] — the court's pronouncements have a direct bearing on this case."  (*Carlsson*, *supra*, 163 Cal.App.4th at p. 292.)  Specifically, "[t]he high court noted that '[a]lthough some informality and flexibility have been accepted in marital dissolution proceedings, such proceedings are governed by the same statutory rules of evidence and procedure that apply in other civil actions.'  [Citation.]  'Ordinarily, parties have the right to testify in their own behalf [citation], and a party's opportunity to *call witnesses to testify and to proffer admissible evidence is central to having his or her day in court*.'  [Citation.]  Emphasizing a party's 'fundamental right to present evidence at trial in a civil case' [citation], the *Elkins* court went on to declare, '"One of the elements of a fair trial is the *right to offer relevant and competent evidence on a material issue*.  Subject to such obvious qualifications as the court's power to restrict cumulative and rebuttal evidence . . . , and to exclude unduly prejudicial matter [citation], denial of this fundamental right is almost always considered reversible error"' [citations]."  (*Ibid.*, original italics.)

9

The same is true here. Due process required the trial court to decide the material issue of father's alleged death threats and to afford mother the opportunity to offer relevant and competent evidence on that issue. The court apparently believed the matter, if addressed at all, should be decided by Danish authorities upon Mia's return. The court admitted only two pieces of evidence, a Danish court order vesting custody with father in 2012 and another order reiterating that decision just a few months later. Both orders predated father's alleged 2013 e-mail death threats against Mia's sister still in his custody and against mother. It is not clear whether the proceedings resulting in either order adjudicated mother's allegations of similar prior threats. The trial court simply observed regarding Denmark that "[t]hey are a civilized country" and remarked to mother that Danish courts were "fully capable of making a decision, in the best interest of the minor children, even though you might not like the decision or they may not, factually, find your side to be true."

There are two manifest flaws in simply leaving the issue of death threats and other unresolved material facts for Danish authorities potentially to address. First, it is true that "the Convention prohibits courts in countries other than that of the child's habitual residence from 'adjudicating the merits of the underlying custody dispute,' [citation]." (*Sealed Appellant*, *supra*, 394 F.3d at p. 344.) But it is necessarily also true that a Hague Convention court must consider in the first instance respondent's allegations of grave risk that postdate earlier foreign custody orders. (See *Danaipour*, *supra*, 286 F.3d at p. 15 ["the Convention assigns the task of making the 'grave risk' determination to the court of the receiving country"].) Courts must consider these issues in deciding whether to impose undertaking requirements if the court orders the child's return, or to deny the child's return. (E.g., *Van De Sande*, *supra*, 431 F.3d at p. 570; *Walsh*, *supra*, 221 F.3d at p. 220.) As the court in *Danaipour* explained, the trial court there erred in "cut[ting] the inquiry short" on a parent's alleged sexual abuse because

10

"only once [the court] had made such a finding could [it] ask the right questions about whether the children could be returned . . . ." (*Danaipour*, at p. 19.)

Second, "[t]he Convention says nothing about the adequacy of the laws of the country to which the return of the child is sought—and for good reason, for even perfectly adequate laws do not ensure a child's safety." (*Khan*, *supra*, 680 F.3d at p. 788.) The rendering court itself must ascertain and protect the child's safety (*ibid.*), and to do so it must adjudicate factual disputes bearing on that question, including the alleged death threat here.

Father asserted at oral argument, but not in his briefing, that mother somehow waived the trial court's failure to decide the authenticity of the death threat e-mail. Not so. The trial court's duty to resolve such critical issues in Hague proceedings "is not waived—indeed it is at its most exacting" when the parents' evidence conflicts and it seems "impossible to demonstrate by objective evidence which one is telling the truth, or more of the truth." (*Khan*, *supra*, 680 F.3d at p. 785.) Moreover, the record indicates it would have been futile for mother to press for a ruling on an issue the trial court repeatedly stated—without hearing the evidence— it could not and would not decide. There was no forfeiture.

Father also suggested at argument that the trial court's failure to decide the death threat issue was harmless, but the suggestion is preposterous. As father's briefing acknowledges, a credible death threat "automatically constitute[s] a grave risk of harm" prohibiting the child's return. The trial court could not duck the issue. (See *Van De Sande*, *supra*, 431 F.3d at p. 570 [summary judgment inappropriate to resolve contested death threats in Hague proceeding].)

C.    *Mother's Evidence of Father's Extensive History of Abuse*

According to mother, by refusing to decide critical issues like whether father threatened to kill her and the children, and by systematically excluding evidence to

11

support her allegations of abuse, the trial court received only a limited and inaccurate picture of the case, and therefore could not fairly decide the matter.  As we explain in Part D. below, we agree and therefore remand for the trial court to conduct a new trial.

According to mother, after father moved the family temporarily to Germany for job training, with plans to resume his employment in the United States within a year, father lost the job before completing the training, became violently abusive towards her and the children, sexually assaulted her, and made death threats against her.  While unemployed, he often took the children to Denmark without her, then forced the children to move there, and continued to physically and emotionally abuse them.

Mother attempted to show in the exhibits and testimony that the trial court excluded that father engaged in a continuous pattern of abuse against her and the children and, once in Denmark, embarked on a course of conduct to cut her out of their lives.  He refused to apply for a visa on her behalf or include her on a family visa with the children, but she found her own way to Denmark on a work visa.  He harassed her, stalked her at her job and home, and falsely reported her as an illegal alien to Danish authorities to interfere with her parental rights and suppress her allegations of abuse.

According to mother, ample evidence from Denmark supported her abuse allegations, but the trial court declined to admit the evidence or permit a full and fair hearing on her claims.  Her excluded documentation included reports in which Danish social workers and medical personnel observed the children's injuries allegedly inflicted by father, and the children confirmed the abuse outside mother's or father's presence. Mother's translated documentary evidence included reports stating as follows:  "The family advice service of the Municipality of Ikast-Brande has spoken with Mia and Sarah, cf. Section 11, Subsection 2 of SEL.  During the meeting with Mia it transpires that there has previously been violence at home from the father towards the mother and Mia"; "Mia also says she does not like being at her father's as he often hits them. . . .  We speak a little about the frequency of the violence, to which Sarah and Mia say

12

concurrently that Sarah is hit every day and that Mia is not hit quite as often. Without being asked, Mia pulls up her sweater and shows a bruise. . . . Mia also says immediately unaffected that she has also previously suffered a black eye . . ."; and "It is decided to direct Tammy not to deliver Mia and Sarah today because of suspicion of violence. The grounds for the decision are that the State Administration suspects that Christian has committed violence against Mia and Sarah and to support Tammy in protecting her children against putative violence."

Mother asserted the children reported the abuse to other adults, who in turn reported them to Danish authorities, including reports by mother's landlord: "The children also volunteered to me that their father hit them and bullied them," "During those visits, I observed bruises on both Sarah and Mia. As a father of three boys, one of whom engages in extreme sports, I am familiar with ordinary bruises that children experience. The location and frequency of these bruises were not consistent with bruising I was familiar with. To me, they indicated grabbing and squeezing very hard, or smack, on the arms and legs."

Mother's excluded evidence included emergency room reports in which Mia complained father struck her on the head with a large book when she was seven years old, causing "palpable tenderness," a headache, and nausea, and a few months later gave her a black eye. Another emergency department report included color photographs of a large bruise on Mia's forearm that she told the doctors father inflicted by grabbing her violently. Other hospital reports showed similar injuries to Mia's younger sister, Sarah. The trial court did not review any of mother's exhibits, but simply excluded them in a summary order from the bench.

Mother sought to introduce other evidence showing the abuse continued unabated over the next four years, when Mia finally began running away from father. In a letter to a third party, Mia explained she ran away because father hit her and when she wrote to him that she "did not want to live with him," he rejected her plea. She wrote

13

that she looked forward to turning 10 years old because "[t]he State Administration and Anni from Children's Welfare have told me that when I turn 10 I will [get] to choose where I am to live . . . ." As with all of mother's exhibits, the trial court summarily excluded the letter.

An earlier handwritten note by Mia at age eight recorded that when father failed to relinquish her and Sarah for visitation with her mother, and instead "took us out of town," a social worker or other authority figure called on the telephone, but father "took the phone and covered it and told me what I should say and he stood just by the side of me when I spoke with Anne." Mia stated in the note that she was "afraid because when I was little . . . he always used to hit my mother and because he has been angry . . . and because he did this to my little sister Sarah . . . ." The note closed, "I do not want to live with my father and absolutely [do] not want him to take us out of the town again!" She also reported to social service authorities an incident in which father followed mother when she was picking Mia, Sarah, and a friend up at their school, and when Mia turned to look, mother "was holding her hand up to her head as it looked as if he was hitting [her]."

Another excluded report noted mother's confusion and helplessness because she was "criticized by a number of authorities for delivering Mia and Sarah to [father] because he was suspected of . . . being violent towards the children, while other authorities had established that she should deliver the children in accordance with the current visitation rights agreement." In the same report, Mia answered "in a very loud and determined voice that 'it's a massive yes that he hits us.'" She noted her younger sister, Sarah, bore the brunt of the abuse. Sarah and Mia confirmed "concurrently" that father hit Sarah "every day."

Mother's other excluded evidence showed a pattern of domestic violence that continued for years. According to mother, she and her neighbors called the police in April 2009 when father stabbed at her face with a knife in the children's presence. Her mother reported another incident later that year in which she saw father brandish a knife

14

in mother's face. According to the grandmother, while father was charming initially, the abuse dated to when father lost his job in Germany in 2007, and continued until Mia fled in 2013. The grandmother observed father sleeping next to Mia naked in her room on one occasion, and suspected sexual abuse based on his remarks, as did other witnesses who heard Sarah's reports about bath time.

Mother's excluded evidence included police reports stating that: "Christian Noergaard has reported Tammy Noergaard as an illegal alien in Denmark . . ."; "A prior police report is also on file where Tammy as alleged to have worked illegally . . ."; and "her ex-husband has not made this any easier for her as we have had to respond to him on a number of occasions, including in connection with inquires from Aarhus police in relation to a false report from him stating that Tammy was working without the necessary residency and work permits and he has also stayed in his car outside the company gates for hours at a time."

Mother sought to explain the precariousness of her immigration status, as highlighted in a report she made to European Union officials investigating Denmark for disparate treatment of non-Danish parents in custody cases. Her Danish attorney explained mother's "legal basis for residing in Denmark derives from her work visa. She does not qualify for permanent residency on the basis of having children with a Danish father and who reside in Denmark, as such is not provided under Danish immigration law. . . . [Thus], should [her] employment cease in the interim, her legal right to say in Denmark would also be extinguished, her permanent residency application denied, and thus she could potentially face deportation to the United States of America *without her children*. The precarious, job-linked residence permit was highlighted as a worrisome aspect of Danish Immigration Law in the European Commission Against Racism and Intolerance (ECRI) Fourth Report on Denmark (2012)[.]" (Original italics.) The trial court summarily excluded the evidence.

15

Among many excluded reports other people made to Danish authorities, mother included the following: "When we drove off, [father] ran a red light almost causing a serious accident with other drivers. . . . Officers Morten and Rasmus had to order [him] to stop stalking us and to leave"; "In July 2012, I contact Danish police . . . after [father] has illegally taken Mia and Sarah to Germany after Tammy gets temporary sole custody"; "I had to speak to police officers after they tr[ied] to arrest Tammy in front of Mia and Sarah on their way to school, on a false police report filed by [father] so she is released. Mia and Sarah have been crying, and Mia is throwing up in the car"; and "Deputy Superintendent Larsen agreed with me that this whole scenario was a severe traumatic experience for the two little girls which should have been avoided."

According to mother, a Danish court-affiliated child psychologist interviewed Mia about running away from her father's home in April 2013, and made the following report: "When asked why Mia does not want to go home to her father's again, she replies she does not want to live with someone who hits her. . . . Mia would try to run away and return to her mother again. . . . In the light of this I would not advise that Mia be forced to have contact against her will. It is my opinion that this would be very costly to her in terms of her mental wellbeing." The trial court excluded the report without reviewing it or any of mother's exhibits.

Mother asserted she and the children had to take refuge in a domestic violence shelter on more than one occasion because of father's abuse. According to mother, United States Embassy personnel in Denmark responded to her pleas "after there was a failure to date in the ability of the Danish administrative and judicial systems to protect and support the American parent and children since their abduction to Denmark by [father]," and that one of those workers witnessed a violent attack by father that put mother in the hospital.

According to mother, a Danish judge not assigned to her case "interfered on numerous occasions with [her] domestic violence proceedings, custody proceedings, as

16

well as . . . directly contacting social services to silence and remove their old social worker from their case after receiving a letter from her also recommending supervision and domestic violence counseling after [father]'s violent episodes. This is despite the fact that he was not the princip[al] judge of deciding on their domestic violence counseling and supervision requests from the court, or even custody, such being heard by a separate judge. . . ." Mother's excluded exhibits included social service agency child custody reports documenting father's abuse, which resulted in interim custody awards in her favor, only to have those reports ignored in custody decisions father secured in other Danish judicial jurisdictions.

Mother claimed Mia ran away from father on multiple occasions in 2012 and 2013, and she asserted father's history of abuse led Mia to take refuge with her maternal grandmother. The maternal grandmother apparently brought Mia to Orange County in June 2013, and mother later joined them there. According to mother, she and others in Denmark and the United States have sought to reach a mutual agreement with father in Mia's and Sarah's best interests, but father "has not cooperated and sabotaged every effort to find a tolerable solution . . . for Mia and Sarah" in Denmark or in the United States.

D.  *The Trial Court Violated Mother's Right to Present Evidence*

As with the alleged death threat e-mail, mother is similarly entitled on remand to an evidentiary hearing on her other claims. A trial court in a Hague proceeding "has a substantial degree of discretion in determining the procedures necessary to resolve a petition filed pursuant to the Convention and ICARA. Specifically, neither the Convention nor ICARA, nor any other law of which we are aware including the Due Process Clause of the Fifth Amendment, requires 'that discovery be allowed or that an evidentiary hearing be conducted' *as a matter of right* in cases

17

arising under the Convention. [Citation.]" (*West v. Dobrev* (10th Cir. 2013) 735 F.3d 921, 929 (*West*), italics added.)

"*Where circumstances warrant*, both the Convention and ICARA provide the [trial] court with 'the authority to resolve these cases without resorting to a . . . plenary evidentiary hearing.' [Citation.]" (*West*, *supra*, 735 F.3d at p. 929, italics added.) Convention Articles 2 and 11 respectively enjoin the court to use "the most expeditious procedures available" and to "act expeditiously in proceedings for the return of the children."

But alacrity in Hague proceedings is not an objective for its own sake. Rather, an overriding issue remains the child's safety. As in *Van De Sande*, where the district court "inexplicably" ignored the father's alleged death threats in summarily ordering return without an evidentiary hearing (431 F.3d at p. 570) and in *Khan*, where the court "declined to decide one way or the other" whether the father beat the child (680 F.3d at p. 786), "[t]he dispatch in this case [was] excessive." (*Id*. at p. 784.) As in those cases, "the procedural adequacy of the proceedings in the [trial] court is the principal issue presented by this appeal." (*Ibid.*)

Here, mother contends the circumstances did not warrant eviscerating her case by: (1) denying her repeated requests to testify; (2) eliminating her right to cross-examine father by dispensing with his testimony; (3) excluding *any* testimony from her extensive list of witnesses; (4) excluding her voluminous exhibit binders with documentation to support her claims and the testimony of her proposed witnesses; (5) admitting *only* father's exhibits, the two Danish court orders; (6) sua sponte quashing her subpoena of an Orange County social worker by precluding any witness testimony; (7) holding in abeyance and effectively excluding a social worker's report that the court conceded "I have not read it and neither will you"; (8) summarily denying mother's multiple requests for an Evidence Code section 730 psychological evaluation for Mia while excluding all mother's foregoing evidence, and (9) denying her request to be

18

present for or to review a transcript of the trial court's in-camera interview with Mia. While some of these rulings *may* have been justifiable alone or in the abstract, considered together we have no confidence mother received a fair or adequate hearing.

In addition to the death threat e-mail, mother alleged other instances of abuse postdating the 2012 Danish court orders, including abuse that led Mia to run away from father in Denmark and take refuge with her maternal grandmother. The trial court relied on father's bare denial of abuse in his declaration, and denied mother's request to present contrary documentary evidence and testimony and to cross-examine father. The trial court also relied on its own interview with Mia in which the court later recounted that Mia denied ever "'recall[ing] running away from my father.'"

After the court conducted its interview with Mia, the court denied mother's renewed request for a psychologist to interview and evaluate Mia under Evidence Code section 730 (section 730 evaluation), despite mother's concerns father exercised his position as an alleged custodial abuser to manipulate Mia's testimony directly or indirectly. Mother also sought the evaluation based on her fear Mia was traumatized into silence about father's abuse when Orange County authorities removed her from hwe mother's care. According to mother, Mia became nauseated during the raid, vomited on a deputy, and protested her removal and release to father's custody. She only acquiesced on being told her mother would be arrested absent her compliance. According to mother, Mia may have viewed the trial court as an arm of the authorities seeking to return her to Denmark and may have believed mother would be incarcerated if Mia did not suppress her earlier abuse claims.

We do *not* hold the trial court was *required* to order a section 730 evaluation, although the trial court may consider that issue on *either* party's motion on

19

remand.[3]  Evidence introduced at a new hearing may render a 730 evaluation unnecessary, or may highlight the need for one.  That decision remains for the sound discretion of the trial court on remand.   We simply hold the trial court was required to afford mother the opportunity to present evidence supporting her claims and to consider that evidence in a full and fair hearing.

For example, mother attempted to support her claim Mia ran away from father with a written report from a Danish court-affiliated expert in which *Mia* told the psychologist she fled because father hit her and her sister.  The trial court, however, refused to consider the report or to admit *any* of mother's supporting documents as exhibits.  Instead, the trial court selectively admitted into evidence only father's exhibits.  Mother's witness list included a Danish child welfare worker who assisted the psychologist in preparing the report and attempted to aid Mia in finding safe housing away from father, but the trial court refused to allow mother to call *any* witnesses or to testify to her concerns about Mia.

Mother's witness list also included a psychologist to testify "regarding the impact of abuse and exposure to abuse on a child, as well as a child's reaction to abuse and exposure to abuse."  Mother also sought to call the social workers who interviewed Mia at Orangewood and to obtain the social service agency's report, if any.  The court conceded a report existed, but declined to review it or allow mother to review it.  According to mother, the agency could not have meaningfully investigated her reports of abuse because it released Mia immediately to father's custody before any supporting reports from Denmark could arrive.

Based on these and similar examples from the  record, the trial court could not simply ignore or decline to hear mother's evidence or proposed testimony and deem

---

[3]      Father, like mother, harbored concerns the other parent unduly influenced Mia's account of events, and the trial court was inclined to think after the brief in-camera session that the maternal grandmother also may have exerted a strong influence on Mia.

20

the matter fully heard and fairly resolved. As the *Carlsson* court explained, "'"The trial of a case should not only be fair in fact, but it should also appear to be fair." [Citations.] A prime corollary of the foregoing rule is that "A trial judge [must] keep an open mind until all the evidence is presented to him."' [Citation.]" (*Carlsson*, *supra*, 163 Cal.App.4th at pp. 290-291.) It is no surprise the trial court reached the conclusions it did based on admitting only father's exhibits and excluding all of mother's exhibits and testimony.

The court also relied heavily on its brief, in-camera interview with Mia. During the interview, Mia denied fearing father, but when the court asked Mia, "Do you need help through a mental health professional to decide if your father hit you or treated you badly," Mia wanted to know what a "mental health professional" was, and when told "psychologist or psychiatrist," she answered, "Well, maybe." Mia explained she was "confused," "still a little mixed up about things going on," had "been thinking so many things," "hearing so many things," and "want[ed] . . . to get help to seeing what the truth [is] and what's not."

It was the trial court's role as the trier of fact to ascertain the truth, but where the only witness the court permitted to testify expressed doubt about the truth, mother should have been allowed to support her claim Mia's reticence arose from her forceful detention and father's influence, including a history of abuse. After preventing mother from calling any witnesses and declining to consider her supporting exhibits and documentation, the court could not make an informed and fair decision.

Mia's return to Denmark under the trial court's original order, now reversed, does not moot this appeal or further proceedings below. (*Chafin v. Chafin* (2013) __ U.S. __, 133 S.Ct. 1017, 1023-1026.) The trial court retains jurisdiction over the proceedings and over father (*id.* at p. 1025), and thereby may ensure Mia's return if necessary (*ibid.*).

The unfortunate irony in this case is that mother claimed the *Danish* courts failed to afford her a full and fair hearing on her claims father abused her and the children. According to mother, the Danish courts ignored and never decided *her* Hague petition and custody claims alleging father issued death threats against her and the children when he lost his job during their temporary stay in Germany. According to mother, *father* violated the Hague Convention by abducting the children to Denmark or retaining them there in interference with her parental rights, including by trying to exclude her from the children's lives by having her deported from Denmark.

The trial court denied mother's request to introduce testimony and supporting evidence showing that, in addition to failing to adjudicate her Hague claims, the Danish courts declined to allow her to present written evidence of her abuse allegations and denied her a fair trial when a Danish judge that was not hearing her case improperly interfered in the proceedings by prohibiting a court-appointed child specialist from submitting evidence of abuse. Mother asserted European Union authorities have issued reports on her case and similar cases that Danish courts may pay only lip service to resolving domestic violence allegations against Danish citizens in custody cases involving a foreign parent.

Mother sought to call witnesses to explain the Danish court proceedings and to call European Union and United States Embassy representatives to explain their respective involvement in ongoing proceedings in Denmark but, as noted above, the trial court declined to hear *any* of her witnesses. As in *Carlsson* where the court summarily ignored the father's evidence, due process requires per se reversal. (*Carlsson*, *supra*, 163 Cal.App.4th at p. 292.)

According to father, mother never presented a Hague petition in Denmark and the Danish courts fully adjudicated and rejected her claims of abuse. Father claims mother is being criminally prosecuted in Denmark for falsifying the e-mail in which he allegedly made death threats. Of course, if mother is prosecuted and acquitted of those

charges, it would *not* obviate the trial court's duty on remand to ascertain whether mother falsified the e-mail or whether father actually issued the threat. The different standard of review in criminal and civil proceedings and the court's duty to determine the risk of harm to a child, if any, requires an independent evaluation. (See *Guardianship of Simpson* (1998) 67 Cal.App.4th 914, 933-934 [father's acquittal on murder charges did not obviate inquiry in custody proceedings into circumstances of the alleged killings, based on obvious relevance to children's safety].)

The same may be true concerning criminal abuse allegations against father in Denmark. According to father, he was acquitted of one allegation of domestic violence in a criminal proceeding that went to trial, and Danish prosecutors declined to bring charges against him on other incidents mother alleged. It is not clear from a brief review of the Danish custody decisions admitted into evidence whether the courts in those civil custody proceedings *adjudicated* mother's claims of abuse, or whether they simply restated the fact that father was acquitted on one count and not criminally prosecuted on others.

On remand, the trial court must resolve the parties' conflicting claims and determine *what* was adjudicated in the Danish custody proceedings. Indeed, the original court custody order in father's favor does not appear to be in the record or among the two subsequent Danish decisions the trial court admitted. This oversight must be corrected and may shed light on what actually occurred in Denmark. Mother's evidence suggests there were several custody orders in her favor, but in excluding mother's exhibits and admitting only father's, the court denied mother a full and fair hearing. It is far from clear whether mother's claims of abuse were actually addressed and adjudicated in the Danish proceedings.

The court must determine, with the parties' help, whether the Danish civil courts in custody proceedings have the authority to independently determine whether domestic violence has occurred when there has been an acquittal in criminal proceedings

23

or it is not criminally charged. More to the point, the trial court must determine *in this case* whether the Danish court that awarded custody to father actually heard and adjudicated mother's claims of abuse. If not, the trial court must determine whether the Hague Convention nevertheless requires it to extend a comity or collateral estoppel effect to father's acquittal on one charge in Denmark or to the decision by Danish civil authorities not to prosecute him on others.

The trial court must make these findings for two reasons. First, clearly ascertaining what has been decided in Denmark will resolve what mother can litigate in her claim of grave risk. Specifically, it will affect whether she can include abuse allegations that predated the 2012 Danish court orders, based on her contention those claims have never been adjudicated. And it also impacts whether she can assert Denmark is not Mia's place of habitual residence, based on her contention her factual claim of prior abduction has never been adjudicated.[4] Secondly, the trial court must determine what occurred in the Denmark proceedings so it can fully and fairly assess mother's claim under the Convention that her or Mia's fundamental rights will not be protected there. (Convention, art. 20.)

In sum, due process requires that we reverse and remand the matter so mother may have her day in court. We express no opinion on the merits of mother's or father's claims; rather, we reverse merely to ensure that the parties' triable issues are in fact tried on a full and fair presentation of their evidence. (*Khan*, *supra*, 680 F.3d at p. 788 ["The essential point is that the evidentiary hearing was inadequate"].)

It is possible, even likely, other proceedings in Denmark or the European Union have outstripped our discussion, requiring careful inquiry on remand into what has

---

[4] Father claims mother stipulated in the trial below to Denmark as Mia's habitual residence, which mother denies. On remand, we return the case to its posture before trial, and therefore any prior trial stipulations are void but may be renewed with the parties' consent.

occurred and its collateral estoppel or comity effect, if any. With its international law dimension and fraught issues of a family torn apart across borders, this case is undeniably complex. But that complexity, if the parties are unable to resolve their differences, is all the more reason not to short-circuit the adjudicative process.

## III

## DISPOSITION

The judgment is reversed and remanded for further proceedings consistent with this opinion. The parties shall bear their own costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CHRISTIAN THORSEN NOERGAARD, | |
| Plaintiff and Respondent, | G049854 |
| v. | (Super. Ct. No. 14FL000022) |
| TAMMY NOERGAARD, | ORDER GRANTING REQUEST FOR PUBLICATION |
| Defendant and Appellant. | |

The Family Violence Appellate Project has requested that our opinion, filed on December 16, 2015, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

The opinion is ordered published in the Official Reports. (Cal. Rules of Court, rule 8.1105(b).)

                                        ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


MOORE, J.

26