POSNER, Circuit Judge.
The International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq., which implements the Hague Convention on the Civil Aspects of International Child Abduction, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 (Oct. 25, 1980), entitles a person whose child has been removed from his custody (sole or joint) to the United States (usually by the other parent) to petition in federal or state court for the return of the child. 42 U.S.C. § 11603(a), (b). The petitioner in this case is the father, and the respondent, his wife, is the mother. She removed the child from their joint custody and is thus the “abductor.” The child is a girl not yet 4 years old, who in consideration of her privacy is referred to in the briefs and record only as ZFK.
The father, an optometrist in Edmonton, Alberta (Canada), wants to take the child back to Edmonton. He has filed for divorce in Canada on the ground of the mother’s “physical or mental cruelty” to him, and seeks sole custody of the children (there is a second child). The mother, a U.S. citizen living in Illinois, wants to keep the children with her in the United States. The district court ordered ZFK returned to Canada with her father, and the mother appeals. The child was taken from her mother on March 9 of this year by U.S. Marshals, pursuant to an ex parte order by the district judge upon the claim of the father’s lawyer that the wife is a flight risk because India, which the family was visiting when the mother flew to the United States with ZFK, is not a signatory of the Hague Convention, and so she might decide to fly back to India, taking the child with her. (Both parties are of Indian ethnicity.) Until our order of May 1, discussed below, was executed, the child was living with her father in a hotel in Chicago. The order (which was carried out on May 3) directed that she be returned to her mother’s custody pending the final disposition of the appeal.
“The [Hague] Convention was created to discourage abductions by parents who either lost, or would lose, a custody contest.... The Convention drafters adopted a ‘remedy of return’ ... to discourage abductions, reconnect children *784 with their primary caretakers, and locate each custody contest in the forum where most of the relevant evidence existed. [But] while the remedy of return works well if the abductor is a non-custodial parent, it is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent’s violence.” Merle H. Weiner, “Navigating the Road Between Uniformity and Progress: The Need for Purposive Analysis of the Hague Convention on the Civil Aspects of International Child Abduction,” 33 Colum. Human Rts. L.Rev. 275, 278-79 (2002) (citations omitted), quoted in Van De Sande v. Van De Sande, 431 F.3d 567, 568 (7th Cir.2005). See also Karen Brown Williams, “Fleeing Domestic Violence: A Proposal to Change the Inadequacies of the Hague Convention on the Civil Aspects of International Child Abduction in Domestic Violence Cases,” 4 John Marshall L.J. 39, 42-45 (2011); Noah L. Browne, Note, “Relevance and Fairness: Protecting the Rights of Domestic-Violence Victims and Left-Behind Fathers Under the Hague Convention on International Child Abduction,” 60 Duke L.J. 1193, 1202-05 (2011); Roxanne Hoegger, “What If She Leaves? Domestic Violence Cases Under the Hague Convention and the Insufficiency of the Undertakings Remedy,” 18 Berkeley Women’s L.J. 181, 187-88 (2003); Merle H. Weiner, “International Child Abduction and the Escape from Domestic Violence,” 69 Fordham L.Rev. 593, 634 (2000). As these articles explain, domestic violence is a common inciter to “abduction” — the abused spouse flees and takes her children with her. Accusations of domestic violence figure in the present case, as we are about to see.
Article 13(b) of the Convention provides a defense to the return of the “abducted” child if “there is a grave risk that [the child’s] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.” The respondent (the abductor) must prove this defense by clear and convincing evidence, 42 U.S.C. § 11603(e)(2)(A), and Hague Convention proceedings must be conducted with dispatch. Art. 11; March v. Levine, 249 F.3d 462, 474 (6th Cir.2001). (The articles that we cited explain that the framers of the Convention believed that abductors would mainly be abusive fathers rather than abused mothers. This may explain the heightened burden of proof that Congress imposed in the statute implementing the Convention.) The dispatch in this case may have been excessive — the procedural adequacy of the proceedings in the district court is the principal issue presented by the appeal. The only other issue is whether the father abandoned his custodial rights during the family’s trip to India; we think it clear he did not.
The parties became husband and wife in an arranged marriage two years before the birth of ZFK, their first child. During the family’s visit to India that we mentioned the wife complained to the Indian police of domestic abuse. The police investigated, charged the husband, and took away his passport; and it was in April of last year, while he was thus marooned in India, that the wife (pregnant at the time with their second child) flew to the United States with ZFK. Eventually the husband’s passport was returned and he flew back to Canada and some months later, in February of this year, filed the petition for the return of the child. That child was born in the United States after the mother had brought ZFK here and is therefore a U.S. citizen. The father does not argue that the mother abducted that child, who continues to live with her mother.
On March 7 the father obtained an ex parte order from the district court requir *785 ing the mother to yield custody of ZFK to him pending resolution of his petition, and on the thirteenth the judge scheduled an evidentiary hearing for March 22. It was held that day, with the judge as trier of fact since it was an equitable proceeding. He issued a final order of return the next day and also ordered the wife to hand over ZFK’s passport to her husband so that he could take the child back to Canada. But the judge conditioned the orders on the husband’s agreeing to pay a retainer (though not necessarily any additional fees) for an attorney who would be hired by the wife to handle the divorce and custody proceeding that her husband has begun in Canada.
On the wife’s motion we stayed both the order of return, and the order that she turn over the child’s passport to her husband, pending the decision of her appeal. And on May 1, after hearing oral argument in the appeal the day before, we ordered the child returned to the mother pending our decision, but that both the mother’s passport and the child’s passport be held by the U.S. Marshals Service until further notice.
The wife’s testimony, if believed, reveals that her husband has a -violent, ungovernable temper, had physically abused her on many occasions, some in the presence of ZFK (and in front of the child he had told his wife he would take out her eyeballs— though the child, not quite 3 years old at the time, may not have known what “eyeballs” are), had been rough on occasion with the child — indeed terrified the child— and that the child’s mood had brightened greatly when she was living apart from her father. But if the husband’s testimony is believed, he was, if not a model husband, not an abuser of his wife or the child. His lawyer conducted a vigorous cross-examination of the wife, based in part on discrepancies between her testimony at the evidentiary hearing and a deposition she had given a few days earlier. She stood her ground, making few concessions to the cross-examining attorney.
Rule 52(a)(1) of the civil rules requires the judge to “find the facts specially and state [his] conclusions of law separately” when he is the trier of fact. He is not excused from this duty in a proceeding under the Hague Convention. And the duty is not waived — indeed it is at its most exacting — when as in this case plaintiff and defendant testify inconsistently and it is impossible to demonstrate by objective evidence which one is telling the truth, or more of the truth. The trier of fact must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants’ testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity.
The process of factfinding in such a situation is inexact and the findings that result are doubtless often mistaken. But the judge can’t just throw up his hands, as happened in this case, because he can’t figure out what is true and what is false in the testimony. There is no uncertainty exception to the duty imposed by Rule 52. As we said in another case, “One cannot but sympathize with the inability of the district judge in this case to say more than he did in justification of the damages that he assessed for loss of consortium. But the figures were plucked out of the air, and that procedure cannot be squared with the duty of reasoned, articulate adjudication imposed by Rule 52(a).” Arpin v. United States, 521 F.3d 769, 776 (7th Cir.2008).
And if there were such an exception, it would not be available when the evidentiary hearing had lasted only a day, as in this case. The judge could have *786 adjourned the hearing for a few days to enable additional evidence to be obtained and presented; in particular he could have had ZFK examined by a child psychologist. The wife’s lawyer — his initial proposal of an expert witness having been turned down because the witness hadn’t had time to examine the child (remember that the hearing was held only two weeks after the respondent learned about the suit) — offered to submit an evaluation based on an examination of the child by the end of the week. The judge refused. His final order, issued as we said the day after the hearing, is two pages long and contains no findings of fact relating to the Article 13(b) defense — just a conclusion that the wife had failed to meet her burden of proof. That was not a finding of fact, but a conclusion of law. Rule 52(a)(1) requires both: that the facts be found “specially” and the conclusions of law stated separately. It is needless to add that there is no rule exempting the judge from the duty of finding the facts in cases in which the plaintiff has a higher burden of proof than the usual civil burden of the preponderance of the evidence.
But at the end of the evidentiary hearing the judge had had a discussion with the lawyers, and from that we can piece together his thinking and extract a single, solitary factfinding.
The judge began by saying, directly after the parties’ witnesses had testified (there were no closing arguments), that “neither — none of the parties to the suit are residents of Illinois.” Not true; the wife is currently a resident of Illinois. The judge said that “if I send it [the issue of custody of the child] back to Canada, the Canadian courts presumably will look and take evidence and so forth and hear essentially the same evidence, I guess, I’m hearing today and make a decision to award custody to the mother or to the father.... [Under the Hague Convention] the child is to be returned except where there’s grave risk of harm to the child. And, now, there’s — presumably, there’s always some risk. All I know is what I heard here today. And I’m — there’s been a he said/she said hearing today. And it’s very difficult for me to say categorically one side is telling the truth and one side is not telling the truth.” The judge mentioned a bruise that the mother had received on her arm in India and that had been photographed at the police station and was a basis for her complaint to the police. The judge said that if the father had inflicted the bruise — which he declined to decide one way or the other — that was a bad thing to have done but it hadn’t created a “grave risk,” a key term in Article 13(b). But the issue was not creating a grave risk to the mother, but a grave risk (of psychological harm) to the child. If the mother’s testimony about the father’s ungovernable temper and brutal treatment of her was believed, it would support an inference of a grave risk of psychological harm to the child if she continued living with him.
Very little of the wife’s testimony was so much as mentioned by the judge, even though the wife had testified that she’d been beaten with a pillow (which may sound like a pillow fight, but it was a sofa pillow that he beat her with in no friendly fashion and she testified that it hurt), knocked down by him in front of ZFK, hit in the chest by a heavy wallet that he had hurled at her, choked by him twice (and she said she thought she would die) when she was pregnant with her second child, threatened as we said with having her eyeballs yanked out, and dragged bodily from the backyard into a room in the house.
Supervised Visitation Services of Chicago, funded by the City, supervises visits by *787 noncustodial parents to their children. It supervised ZFK’s visits to her mother after the marshals had transferred the child to the father’s custody on March 9. One of the supervisors testified that when the visit was over and she (the supervisor) told the child that she was taking her back to her father, the child became hysterical. The supervisor testified that the child had seemed “in major distress” — “bigger than” (normal) “separation anxiety.” In cross-examination she said “I do feel it wasn’t just a matter of her being upset about leaving her mother. There was definitely a factor there of not wanting to go back to her dad.” She was also worried by the child’s having said without apparent reason when returned to her father “I am a bad girl.”
Another supervisor testified that during another supervised visit the child “said ‘hurt’---- [S]he pointed to her arm, and then said something about Dad.... [S]he said: ‘I’m scared.’ And I asked her to clarify who she was scared of, and she said ‘Dad.’ Or ‘Daddy.’ Something like that.... It was not very clear to me what exactly she was trying to say and what exactly was going on.” About this witness the judge said “she was very, very ... was certainly very, very speculative as to — and couldn’t say specifically whether anything particular happened.”
The mother’s testimony was corroborated by her sister and her sister’s husband. The judge did not mention the testimony of those witnesses, the testimony of the supervisor from Supervised Visitation Services who testified about the child’s having said she “hurt”, or any testimony of the mother except about the bruise on her arm, and he made no finding about whether the father had inflicted it, instead as we noted dismissing it as not evidence of a “grave risk” — to the mother. His focus on the bruise to the exclusion of any mention of the mother’s testimony that her husband had choked her hard enough to make her afraid she would die, or indeed of any of her other testimony, is perplexing.
It is possible that the judge ignored the mother’s testimony because so much of it was about physical and psychological abuse of her by her husband (and her husband’s parents, who lived with them), rather than of the child. But much of that abuse occurred in the child’s presence; and repeated physical and psychological abuse of a child’s mother by the child’s father, in the presence of the child (especially a very young child, as in this case), is likely to create a risk of psychological harm to the child. Whether it is a grave risk, and thus triggers the Article 13(b) defense, is a separate question, but one that cannot be addressed, let alone answered, without recognizing the potential for such a risk in the father’s behavior toward the mother in the child’s presence. All this the judge ignored.
Throwing up his hands at what he may have thought an incomprehensible quarrel between foreigners, the judge remarked that even if the child wouldn’t be safe living with her father, “Why can’t Canada any more than Illinois protect — offer her protection?” The mother’s lawyer pointed out that other witnesses besides the mother had testified and that there was testimony of “multiple instances” of abuse, to which the judge replied: “Then she ultimately should prevail.... Canada should make the decision on who gets custody of the child because the child is a Canadian citizen and domiciled in Canada.” The lawyer as we said asked for a few days to obtain a psychologist’s evaluation of the child and the judge refused.
It seems that the judge, building on his mistaken belief that none of the parties was an Illinois resident, overlooked our *788 warning in Van De Sande v. Van De Sande, supra, 431 F.3d at 570-71, not to treat the Hague Convention as a venue statute designed “to deter parents from engaging in international forum shopping in custody cases” (quoting Baxter v. Baxter, 423 F.3d 363, 367 (3d Cir.2005)). The Convention says nothing about the adequacy of the laws of the country to which the return of the child is sought — and for good reason, for even perfectly adequate laws do not ensure a child’s safety. Because of the privacy of the family and parental control of children, most abuse of children by a parent goes undetected. Pennsylvania v. Ritchie, 480 U.S. 39, 60, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Coy v. Iowa, 487 U.S. 1012, 1022, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (concurring opinion); Van De Sande v. Van De Sande, supra, 431 F.3d at 570-71; Valentine v. Konteh, 395 F.3d 626, 640 (6th Cir.2005) (opinion concurring in part and dissenting in part). ZFK is not yet 4. She is hardly in a position to complain to the Mounties about her father.
If the judge’s order is affirmed, the child’s mother, who appears not to be employed or to have any significant financial resources, will have to hunt up a Canadian lawyer and convince the lawyer to represent her without any assurance of being fully compensated. If able to hire a lawyer she may be able to obtain interim custody of the child from a Canadian court, along with a support order, but what will she do until she obtains that relief? Move back in with the father? Let the child live with him while she returns to the United States while the custody proceeding unfolds? Suppose she eventually wins custody of the child, as is not unlikely since no one accuses her of having abused the child or being an unfit mother. Then ZFK who (until our order of May 1 was executed) had been separated from her mother only since March might not be reunited with her for an indefinite period. Unless a trier of fact determines that the mother is a thorough liar, we are concerned that continuing the child in her father’s custody may inflict psychological harm on her.
But that is an aside. We are not the factfinders. The essential point is that the evidentiary hearing was inadequate. Rule 52(a) was violated; there were no findings of fact on the key issues. Decisions are frequently reversed for such omissions. See, e.g., Freeland v. Enodis Corp., 540 F.3d 721, 739 (7th Cir.2008); Arpin v. United States, supra, 521 F.3d at 776-77; Supermercados Econo, Inc. v. Integrand Assurance Co., 375 F.3d 1 (1st Cir.2004); Rosco, Inc. v. Mirror Lite Co., 304 F.3d 1373, 1379 (Fed.Cir.2002); Zivkovic v. Southern California Edison Co., 302 F.3d 1080, 1090-91 (9th Cir.2002). The failure to allow psychological evidence was another error.
The errors were not harmless. The district court’s order is therefore vacated and the case remanded for a proper hearing. Circuit Rule 36 shall apply on remand. We urge that the proceedings on remand be conducted expeditiously and we suggest that the judge to whom the case is assigned appoint a child psychologist to interview ZFK. See Fed.R.Evid. 706. Our May 1 order shall remain in effect until further notice.
The rulings in this opinion are procedural. We do not prejudge the merits of the Article 13(b) defense. And we remind that the burden of proving the defense is stiff. But whether the burden has been carried cannot be determined in the absence of Rule 52 factfindings.
Vacated and Remanded, with Directions.