**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

<table>
<tr>
<td>

SETH BASIL COLCHESTER,
*Petitioner-Appellee*,

v.

JEWEL LAZARO,
*Respondent-Appellant.*

</td>
<td>

No. 21-35210

D.C. No.
2:20-cv-1571-
JCC

OPINION

</td>
</tr>
</table>

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted August 31, 2021
Seattle, Washington

Filed October 22, 2021

Before: A. Wallace Tashima and Ronald M. Gould, Circuit
Judges, and Jed S. Rakoff,[*] District Judge.

Opinion by Judge Rakoff

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

# SUMMARY[**]

## Hague Convention

The panel (1) vacated the district court's order, after a bench trial, granting a petition for the return of a child under the Hague Convention on the Civil Aspects of International Child Abduction and (2) remanded for appointment of a psychologist and a new trial.

The child's father sought the return of the child to Spain. The mother argued that returning the child to her father, who she alleged had abused both her and her baby, would present a grave risk of psychological or physical harm to the child, and a defense under Article 13(b) of the Convention therefore applied.

The panel held that neither the Hague Convention nor its implementing legislation, the International Child Abduction Remedies Act, provides for appointment of a psychologist as of right. Nonetheless, the district court erred in refusing the mother's request for appointment of a forensic psychologist to examine the child and provide an expert opinion regarding the mother's allegations of abuse and the psychological harm to the child arising therefrom. The panel concluded that the district court's refusal to permit the requested examination amounted to an abuse of discretion that rendered the subsequent bench trial fundamentally unfair.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the district court also erred by failing to make findings of fact adequate to support its order returning the child to Spain under Fed. R. App. P. 52(a).

---

**COUNSEL**

Aaron P. Brecher (argued), John W. Wolfe, and Melanie Phillips, Orrick Herrington & Sutcliffe LLP, Seattle, Washington, for Respondent-Appellant.

Caleb O. Bonm (argued), William J. Bender, and Peter Offenbecher, Skellenger Bender P.S., Seattle, Washington, for Petitioner-Appellee.

William D. Dalsen, Proskauer Rose LLP, Boston, Massachusetts; Margaret A. Dale and Lucy Wolf, Proskauer Rose LLP, New York, New York; for Amici Curiae Sanctuary for Families, Legal Momentum, Women's Legal Defense and Education Fund, Family Violence Appellate Project, Joan S. Meier, Lawyers Committee Against Domestic Violence, Legal Voice, Merle H. Weiner, Sexual Violence Law Center, and Washington State Coalition Against Domestic Violence.

Angela Vigil, Baker & McKenzie LLP, Miami, Florida; David Zaslowsky, Nicole Ford, Debra Dandeneau, and Kirsten Jackson, Baker & McKenzie LLP, New York, New York; for Amici Curiae National Association of Social Workers, Pamela Krasner, Dr. Stephanie Brandt, Dr. Marie Rudden, Professor Evan Stark, and Professor Jeffrey L. Edleson.

**OPINION**

RAKOFF, District Judge:

This case concerns the balance between expeditiously adjudicating a petition for return of an abducted child under the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention") and thoroughly assessing allegations of domestic violence to determine whether return would subject that child to a grave risk of physical or psychological harm.

Here, the district court erred in two ways. First, it ordered a six-year-old child returned to her father in Spain without permitting the respondent mother to develop the evidence necessary to mount her defense. In particular, she argued that returning the child to her father, who she alleged had abused both her and her baby, would present a grave risk of psychological or physical harm to the child. She therefore asked the court to appoint a forensic psychologist to examine the child in depth and provide an expert opinion, which, she believed, would confirm her contested allegations of abuse as well as the psychological harm to the child arising therefrom. But the district court summarily denied the application. While neither the Convention nor its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), provides for appointment of a psychologist as of right, and this Court establishes no such blanket rule, here, for reasons detailed below, the district court's refusal to permit the requested examination amounted to an abuse of discretion that rendered the subsequent bench trial fundamentally unfair.

Second, and independently, the district court erred by failing to make findings of fact adequate to support its order returning the child to Spain. The only findings of fact

supporting the post-trial return order were those portions of the petitioner's proposed findings of fact that the district court simply adopted by reference. But the petitioner's proposed findings were entirely conclusory and failed to engage with any of the evidence or testimony adduced at trial. Federal Rule of Civil Procedure 52 demands more.

Accordingly, we vacate the order below and remand this matter to the district court for appointment of a psychologist and a new trial.

## BACKGROUND

### I. Legal Framework

"The Hague Convention is a multilateral international treaty on parental kidnapping" that "seeks to deter parental abductions." *Holder v. Holder,* 305 F.3d 854, 859–60 (9th Cir. 2002) (*Holder I*).[1] The objects of the Convention are to "secure the prompt return of children wrongfully removed or retained in any Contracting State," Hague Convention, Oct. 25, 1980, art. 1., 19 I.L.M. 1501, 1501, and to ensure that parents cannot gain "tactical advantages" in child custody proceedings "by absconding with a child to a more favorable forum" or by otherwise undermining custody decrees entered in the country of the child's habitual residence, *Holder v. Holder*, 392 F.3d 1009, 1013 (9th Cir. 2004) (*Holder II*). "The Convention's focus is thus *whether* a child should be returned to a country for custody proceedings and not *what* the outcome of those proceedings should be." *Id.*; *see also* Convention, art. 19, 19 I.L.M. at

---

[1] Unless otherwise specified, all internal quotation marks, citations, emphases, elisions, and alterations are omitted from all sources cited herein.

1503 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

The United States is a party to the Convention, and Congress has implemented it domestically by enacting ICARA, 22 U.S.C. § 9001 *et seq.* ICARA grants federal district courts concurrent jurisdiction with state courts over petitions arising under the Convention that seek return of children wrongfully removed or retained. *Id.* § 9003(a). We have jurisdiction over appeals from ICARA proceedings under 28 U.S.C. § 1291. *Flores Castro v. Hernandez Renteria*, 971 F.3d 882, 886 (9th Cir. 2020).

"[T]he Convention's central operating feature is the return remedy." *Abbott v. Abbott*, 560 U.S. 1, 9 (2010). Contracting states commit to "use the most expeditious procedures available" to decide petitions arising under the Convention, with decisions generally expected within six weeks from the date of filing. Hague Convention, arts. 2, 11, 19 I.L.M. at 1501–02. Where a parent files a petition for return alleging that a child under the age of 16 was wrongfully removed or retained within the last year, "the country to which the child has been brought must 'order the return of the child forthwith,' unless certain exceptions apply." *Abbott*, 560 U.S. at 9 (quoting Convention, art. 12, 19 I.L.M. at 1502).

Among those exceptions is the "grave risk" defense: Article 13(b) of the Convention provides that "the judicial . . . authority . . . is not bound to order the return of the child if the person . . . which opposes its return establishes that . . . there is a grave risk that his or her return would expose the child to physical or psychological harm or would otherwise place the child in an intolerable situation." Convention, art. 13(b), 19 I.L.M. at 1502. The case law reflects that

"domestic violence is a common inciter to 'abduction'—the abused spouse flees and takes her children with her." *Khan v. Fatima*, 680 F.3d 781, 784 (7th Cir. 2012). This "grave risk" defense thus reflects the proposition that "the remedy of return . . . is inappropriate when the abductor is a primary caretaker who is seeking to protect herself and the children from the other parent's violence." *Id.*

A respondent parent can establish a grave risk of harm from abuse "where the petitioning parent had actually abused, threatened to abuse, or inspired fear in the children in question." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Spousal violence may also "establish a grave risk of harm to the child, particularly when it occurs in the presence of the child." *Id.*; *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (2016); *Khan*, 680 F.3d at 787; *Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000) ("[C]redible social science literature establishes that serial spousal abusers are also likely to be child abusers.").

We have repeatedly stated that the grave risk exception is "narrowly drawn," so "as not to impair the Convention's general policy." *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010). ICARA requires that a respondent must establish the Article 13(b) grave risk defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A). And even when the respondent establishes that a grave risk of harm exists, the court may still order the child's return if it determines there are ameliorative measures that would "allow both the return of the child[] to [his or her] home country and [the child's] protection from harm." *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005).

## II. Factual & Procedural History

### A. Lazaro's Flight From Spain With S.L.C.

S.L.C. is the now-six-year-old, U.S.-citizen daughter of Appellant Jewel Lazaro, who resides in or around Seattle, WA, and Appellee Seth Colchester, who resides in or around Barcelona, Spain. In January 2020, Colchester was given sole custody of S.L.C. by a Spanish court sitting in Barcelona. Lazaro, who lacked the resources to live in Spain fulltime, was visiting Colchester and S.L.C. in April 2020, as the COVID-19 pandemic erupted. According to Lazaro's testimony at the bench trial below, during that visit Colchester often "screamed at and acted aggressively toward both her and S.L.C." Lazaro testified about several specific instances of alleged abuse that occurred at the time, including:

- Colchester grabbing S.L.C. by the arm and throwing her down the hallway, leading S.L.C. to cry and hide in her room with Lazaro;

- Colchester screaming at S.L.C. to "get downstairs, before I kick you downstairs" and then kicking S.L.C. down the stairs;[2]

- Colchester screaming at S.L.C. on various occasions for things like not

---

[2] An audio recording of this incident, which Lazaro made without Colchester's knowledge, was played at trial. As Lazaro's briefing highlights, Colchester's explanation for this conduct shifted materially over the course of the litigation, first contending in his pre-trial brief that S.L.C. interrupted a business phone call by knocking on his office door, then testifying at trial that she blocked his way while carrying laundry down the stairs.

> folding his laundry, and sticking his finger in her face and making her cry;

More generally, Lazaro also alleged that Colchester repeatedly screamed at five-year-old S.L.C. and compelled S.L.C. to do various chores, including his dishes and laundry.

Following these incidents, Lazaro absconded with S.L.C. After fleeing Colchester's home, she falsely told local Spanish police that she had legal custody of S.L.C. She also hired a Spanish forensic psychologist, Dr. Alicia Romero Fernandez, who conducted a preliminary examination of S.L.C. for approximately 90-minute via Skype and through a translator. After Lazaro was unable to find anywhere to stay in Spain because of the COVID-19 lockdown, she and S.L.C. fled to the United States using a passport for S.L.C. that Lazaro had previously claimed to have lost. Colchester then filed a Hague Convention application in Spanish court, filed a criminal complaint against Lazaro in Spain, and applied to the governments of Spain and the United States for S.L.C.'s return.[3] The Spanish court eventually issued a warrant, based on an order declaring that Spain was S.L.C.'s habitual residence and that Lazaro's removal of S.L.C. to the United States was wrongful under the Convention.

Lazaro and S.L.C. eventually made it to Washington State, where she filed a pair of petitions for domestic violence orders of protection ("DVOP"), first in Snohomish County Superior Court and then later in King County Superior Court. However, on July 24, 2020, the Snohomish

---

[3] This was Colchester's second Hague Convention petition. In 2018, Lazaro took S.L.C. from Spain to the United States, and Colchester filed a Hague petition in United States courts that resulted in S.L.C.'s return to Spain.

County Superior Court dismissed this petition with prejudice and vacated a temporary *ex parte* order of protection, concluding that the court lacked personal jurisdiction over Colchester, in part because the "court [did] not find that there are any credible allegations of any acts of domestic violence that occurred between the parties within Washington." On October 28, 2020, the King County Superior Court dismissed the second DVOP petition, finding that there had not "been any acts by [Colchester] that have arisen since the Snohomish County action was dismissed on July 24, 2020 that would give this court jurisdiction."

Meanwhile, Colchester filed the instant Hague Convention proceeding on July 20, 2020 in Snohomish County Superior Court, seeking S.L.C.'s return under the Convention and ICARA. On July 24, 2020, the same day Lazaro's DVOP petition was dismissed, the Superior Court issued a writ of habeas corpus and a warrant, authorizing local law enforcement to seize S.L.C. Lazaro responded by fleeing her residence, and she went into hiding with S.L.C., moving between friends' houses in Seattle, having left behind her phone, computer, and car.

## B. The Pre-Trial Proceedings

On October 25, 2020, Lazaro's counsel accepted service of the instant Hague Convention petition and immediately removed this action to the Western District of Washington. Colchester then agreed to quash the warrant, Lazaro came out of hiding, and the parties temporarily placed S.L.C. in the care of her maternal grandmother and aunt in the Seattle area. The district court then set an initial Rule 26(f) case management conference for February 1, 2021.

Colchester filed a motion for immediate return of S.L.C. shortly thereafter, which the district court denied on

December 23, 2020. The district court held, properly relying on the Spanish custody order, that Colchester had undisputed sole custody of S.L.C., that Lazaro had taken S.L.C. to Washington in violation of the Spanish court's custody order, and that therefore "Lazaro cannot meaningfully dispute that her April 2020 removal of S.L.C. was wrongful under Spanish law."[4] However, the court held that Colchester had not yet established that S.L.C. was "'habitually resident' in Spain prior to her removal," and it did not decide whether Lazaro had any viable defenses to S.L.C.'s return. The court concluded by stating that the "matter w[ould] proceed in due course."

After Colchester belatedly requested expedited proceedings in mid-January, the district court held a status conference on January 27, 2021. Lazaro filed a pre-conference memorandum setting forth two limited discovery requests: a psychological examination of S.L.C. and limited document requests.

At the conference, the court questioned why a psychological exam was required, since Dr. Romero had already examined S.L.C. in April 2020 by video. Lazaro's counsel explained that the prior exam was a relatively short "initial screening" conducted through an interpreter and that the psychologist recommended a more extensive examination. Counsel explained that it would be difficult to

---

[4] While the instant litigation was proceeding in the district court, the parties continued to litigate in Spanish courts, including Lazaro's filing criminal charges against Colchester. On January 4, 2021, the Spanish family court hearing Colchester's Hague Convention petition found that Lazaro's flight with S.L.C. was "unlawful" and "without any evidence of violence towards her daughter caused by the father that would justify this," despite testimony from Lazaro regarding Colchester's alleged physical and emotional abuse of S.L.C.

continue working with the Spanish psychologist, not just because of the challenges posed by conducting an effective examination through a translator, but also because the nine-hour time difference would complicate efforts to complete the necessary exams and trial preparation on the expedited schedule Colchester had requested. Counsel further argued that it was necessary to conduct an exam informed by the case law applicable in the district court, which Dr. Romero had not considered. Counsel explained that such psychological exams of children are routine in Convention cases and that Lazaro would develop reliable evidence that S.L.C. suffered psychological harm from Colchester's alleged abuse of her and Lazaro, which would be "critical" to establishing the affirmative defense that S.L.C. faced a grave risk of psychological harm from living with Colchester. In support, Lazaro cited a recent Convention case in the Western District of Washington in which the judge declined to find that a grave risk of harm to the child existed, despite crediting the respondent mother's allegations of severe domestic violence, because no psychological expert testified about the "potential for psychological harm to children in cases of spousal abuse." *Garcia v. Duarte Reynosa*, 2020 WL 777247, at *4 (W.D. Wash. Feb. 18, 2020) (Jones, J.), *reconsideration denied,* 2020 WL 978355 (W.D. Wash. Feb. 28, 2020). Consequently, counsel argued that "we can't rely solely on witness testimony, and the relatively cursory Spanish evaluation, to prove grave risk by clear and convincing evidence." The Court then ruled, without explanation and even though there had been no discovery, that "we're going to have no more discovery. I'm not going to order the evaluation to take place." The court then set a four-day bench trial for February 22, 2021.

## C.  The Bench Trial

The bench trial, conducted over videoconference, started three weeks later. Although the Court, as noted, had refused to order a psychologist to examine S.L.C. for this Hague proceeding, Lazaro attempted to overcome this handicap by presenting evidence of alleged domestic violence through fact witness testimony, medical records, and the testimony of Dr. Romero (the Spanish psychologist who had conducted a preliminary examination of S.L.C. over videoconference in April 2020). But on the first morning of trial, the district court also denied Lazaro's offer for S.L.C. to testify in whatever manner the court deemed appropriate, such as *in camera* and *ex parte*. The court thus precluded the testimony of the person with the most personal knowledge of whether S.L.C. had been abused, namely, S.L.C. herself.[5]

At trial, Lazaro alleged other instances of Colchester abusing her and S.L.C. beyond those said to have occurred during her spring 2020 visit to Colchester's Barcelona home (as previously referenced). These included:

- Throwing a bowl of soup at Lazaro's head, leaving a bruise;

- Keeping Lazaro and S.L.C. "under [his] control financially . . . ma[king] her beg

---

[5] The Court provided the following rationale: "I am not inclined to permit testimony by the child. During some of the events involved here, she would have been three or four years old. She has just turned six years old, and I think it would be a mistake to put a child in the position of testifying in favor of one party or the other and could do permanent scarring to the child. It's just something I don't think is appropriate."

him on a weekly basis just for money for food;"[6]

- Kicking Lazaro in the stomach when she was three-months pregnant with S.L.C. and forcing her to sleep in the closet;

- Punching and screaming at Lazaro when she was seven-months pregnant, after she sat in the driver's seat of his car, then throwing her to the ground, dragging her through the gravel, and leaving her on the side of the road for hours;

- Hitting Lazaro in the head with S.L.C.'s bag, in front of S.L.C.;[7]

- Smashing Lazaro's guitar, in front of S.L.C., after Colchester's associate told him that Lazaro was out with a friend;[8]

---

[6] Lazaro also offered, and there was received in evidence, a 2014 email from Lazaro to an Irish domestic violence support center that states "I am not yet a resident and have no money as my boyfriend[] controls all the finances. . . . I am now almost 7 months pregnant and fearful he could hurt not only me but the baby. Please let me know what I can do as a non resident with close to no money to get myself into a more safe situation." As *amici* Sanctuary for Families, *et al.*, explain, "financial abuse is a common and effective abuse tactic. By ensuring a lack of alternative means of economic support, an abuser restrains his victim from escaping his sphere of control."

[7] This incident is corroborated by a text message exchange between Colchester and Lazaro that was received in evidence.

[8] Lazaro is a musician, and she testified that the guitar was her most valuable possession. This incident is corroborated by a contemporaneous photo message Colchester sent Lazaro that was received in evidence.

- Shoving Lazaro into walls, on numerous occasions, in front of S.L.C.;

- Slapping Lazaro and ripping S.L.C. away, when she was breastfeeding S.L.C. rather than paying attention to Colchester;

- Throwing S.L.C. out of a first-floor kitchen window, after screaming at her about breakfast dishes, then locking S.L.C. outside until dinnertime without giving her food;[9]

Some of these incidents were corroborated with contemporaneous evidence—including text and photo messages exchanged with Colchester, emails to domestic violence organizations, and an audio recording—as well as testimony from cross examination of Colchester's mother. *See supra* nn. 2, 6, 7, & 8.

Dr. Romero testified at trial as a psychological expert in forensic evaluation of children. Her opinions were based entirely on her spring 2020 evaluation of S.L.C. Dr. Romero testified that she concluded there was "the possibility that [S.L.C.] [wa]s being abused by her father" because she "verbalized that she was scared of her father and that she had suffered physical abuse at the hand of the father." She further

---

[9] This incident is reflected in medical records received into evidence, reflecting clinical notes from therapy provided to S.L.C. in May 2020, after her arrival in Washington. The records reflect that S.L.C. "meets the full criteria of Separation Anxiety Disorder," and that she has "[p]ersistent and excessive fear/reluctance about being . . . anywhere, including home, without Mom." The clinical notes also include the assessment that S.L.C. "has ha[d] highly traumatic experiences when staying with her father."

testified that she did "not detect[] any   indication that
[S.L.C.] had been manipulated," and that she did not discern
that Lazaro was affected by any "pathology." Finally, she
testified as to the developmental risks that are created when
an abusive parent obtains sole custody of a child. On cross
examination, Dr. Romero acknowledged that there were
limitations to her opinion—including that she was not able
to do an in-person evaluation and that she was unable to
spend time alone with S.L.C.—and explained that they were
due to the need to respond to the "emergency situation"
presented by Lazaro's flight from Colchester's alleged abuse
and the COVID-19 lockdown measures in place at the time
of her examination.

During closing arguments, the district court made
several comments on the record that reflect its assessment of
Lazaro's evidence of Colchester's alleged abuse. First, while
Lazaro's counsel was discussing S.L.C.'s own previous
statements alleging abuse, the court—which, as noted, had
already precluded S.L.C. from testifying at trial, even *in
camera* and *ex parte*—interrupted to express doubt about the
ability of children to reliably report abuse.[10] The court then
critiqued Dr. Romero's testimony as unworthy of reliance:

---

[10] The court stated: "If we have learned anything in the last ten years,
especially since the McMartin case, is that children of extreme youth—
a three-year old child, for example—are not reliable reporters. In the
McMartin case, kids were saying that Satanic rituals were taking place.
The case over in Wenatchee is another example." Aside from the fact
that S.L.C. was six years old, not three, the forty-year-old McMartin
Preschool case involved children who made false accusations of
molestation and Satanic rituals to interviewers whose tactics were found
to be highly suggestive and significantly deviated from standard
interviewing techniques. *Amici* National Association of Social Workers
*et al.* write that "[f]ar from teaching us that children are apt to lie, the

> "[F]rankly, this psychologist from Barcelona didn't display any understanding of the concerns about relying upon children of extreme youth as reporters. It's very troublesome to me that she would express an opinion that the father was physically abusive based upon an hour-and-a-half Zoom interview. Frankly, upon reconsideration, I have had serious reservations about whether I should have admitted that testimony at all."

After Lazaro's counsel argued that S.L.C.'s statements had been consistent over time, the judge said:

> "Don't you think it's just a little bit preposterous that the father threw her out a window and left her outside all day and into the night without food or drink?"

## D. The Decision Below

The district court issued a five-page order the day after the trial concluded. The order begins by noting that it was undisputed that Lazaro's removal of S.L.C. from Spain was unlawful under the Convention and that the two issues for

---

McMartin Preschool case actually teaches us the exact opposite—that only in the most unusual and egregious situations should we reject as 'preposterous' the horrific stories children tell us. In part due to the studies conducted in the wake of the McMartin Preschool case, the district court's concerns about the reliability of recounted memories and young children's capacity for truthfulness are considered outdated." *Amici* cite several studies regarding the evidentiary value of children's testimony and conclude that "modern research establishes that children can in fact be reliable witnesses," particularly when a trained expert examines a child using validated questioning techniques.

decision were (i) S.L.C.'s habitual residence (not challenged on appeal) and (ii) whether Lazaro had presented clear and convincing evidence that returning S.L.C. to Colchester's custody in Spain would subject her to a grave risk of physical or psychological harm. The Court found for Colchester on both points and ordered S.L.C. returned to Spain, provided that Colchester must facilitate "daily electronic communications" between S.L.C. and Lazaro, and that Lazaro be permitted supervised visits with S.L.C., limited to two days per month.

The district court's order did not discuss any of the testimony or evidence regarding Colchester's alleged abuse. In lieu of setting forth its own findings of fact, the order states that the court "adopts and incorporates paragraphs one through ten and thirteen of Mr. Colchester's proposed findings of fact and conclusions of law."[11] Colchester's ¶ 10 states, in wholly conclusory fashion, that "Lazaro has . . . not presented clear and convincing evidence that the return of the child will present a 'grave risk of harm.'" But it does not address any of the evidence Lazaro presented during the trial. Instead, ¶ 10 states that "[m]any of the allegations of domestic violence and 'drug trafficking' that Ms. Lazaro has raised to attempt to use this 'grave risk' exception . . . were raised and rejected" in prior U.S. and Spanish courts. The only three paragraphs drafted by the court itself setting forth its reasoning discuss Lazaro's unlawful removal of S.L.C. from Spain, her petitions for DVOPs in Washington state courts, and the period during the summer and fall of 2020

---

[11] In so-doing, the Court excluded only ¶ 11 of Colchester's proposed findings, namely that "[t]he evidence . . . does not support Ms. Lazaro's claims that Mr. Colchester is a "drug trafficker" or "money launderer." The proposed findings contain no ¶ 12 because of an apparent typographical error.

when Lazaro absconded from law enforcement; they do not address the substance of Lazaro's grave risk defense.

## DISCUSSION

Lazaro presses several issues on appeal, but we reach only two: whether the district court abused its discretion in denying Lazaro's application to have an expert psychologist examine S.L.C. and whether the findings of fact supporting the order below complied with Fed. R. Civ. P. 52(a). We conclude that the district court erred in both respects. We accordingly vacate the order below and remand to the district court for further proceedings, which shall include appointment of a psychologist to conduct a forensic examination of S.L.C.

## I.   The Psychological Examination

Lazaro's allegations that Colchester had abused both S.L.C. and herself formed the core of her Article 13(b) defense that returning S.L.C. to live with Colchester in Spain would subject S.L.C. to a grave risk of physical or psychological harm. Lazaro therefore argued to the district court at the pre-trial conference that credible testimony from a psychological expert who had examined S.L.C. would be essential to her case, and she sought an order permitting the necessary examination. The district court nonetheless denied her application, apparently because Lazaro could put on Dr. Romero, a Spanish psychologist who had interviewed S.L.C. over videoconference and through an interpreter for 90-minutes, even though, as Lazaro argued, Dr. Romero's brief interview was no substitute for an in-depth interview by a psychological expert. (The court also rejected Lazaro's offer for the judge to hear from S.L.C. herself, either on the stand or *in camera* and *ex parte*.) But after the trial, the district court indicated that it viewed Dr. Romero's

testimony as not credible because her opinion was based on an inadequate examination, the very reason Lazaro had sought a new exam before trial. The court subsequently held that Lazaro had failed to present clear and convincing evidence to establish her Article 13(b) defense.

Lazaro argues on appeal that the district court's refusal to permit an in-depth psychological examination rendered the bench trial unfair. We agree.

## A.  Discovery in Hague Proceedings

Expert testimony from a forensic psychologist can be critical in determining whether a respondent parent's grave risk defense will succeed against a Convention petition for return. Psychological evidence is particularly important in cases like this one, where the respondent (usually the mother) alleges that she fled with her children because the petitioner (usually the father) had abused her and/or her children. In these cases, psychological evidence can be important both because it can help the court determine whether the alleged abuse occurred and because it can aid the court in assessing the effect any abuse had on the child's psychological health.

Courts hearing Convention petitions thus routinely grant requests to order psychological examinations of children and credit testimony of psychological experts.[12] And, as Lazaro

---

[12] *See, e.g.*, *Blondin v. Dubois*, 238 F.3d 153, 160–61 (2d Cir. 2001) (affirming district court's decision to deny return because of an Article 13(b) defense, in reliance on testimony of retained psychiatric expert); *Saada v. Golan*, No. 18-cv-5292 (AMD) (E.D.N.Y. Nov. 15, 2018) (minute entry granting respondent's request for evaluation of a child); *Tsarbopoulous v. Tsarbopoulos*, No. 00-cv-83 (EFS) (E.D. Wash. Feb.

argued below, a district court in this Circuit recently rejected a grave risk defense for lack of a forensic psychologist's testimony, even though the court acknowledged credible allegations of severe domestic violence. *See Garcia*, 2020 WL 777247, at \*4. Indeed, the Seventh Circuit held in *Khan v. Fatima* that it was reversible error for a district court to refuse a respondent mother's request for a psychological evaluation of her child where there was credible evidence that the petitioning father had physically and psychologically abused her in the child's presence. 680 F.3d at 787–88. "The failure to allow psychological evidence," along with inadequate findings of fact, made "the evidentiary hearing . . . inadequate." *Id.* at 788.

Notwithstanding the widespread practice of courts granting psychological exams, Colchester points out that neither the Convention nor ICARA expressly provides for litigants to obtain discovery as of right. The Convention rather obliges signatory parties to "use the most expeditious procedures available" to achieve the objective of adjudicating petitions for return, "do[es] not limit the power of a judicial . . . authority to order the return of the child at any time," and establishes a presumption that petitions will be decided within six weeks from the filing of a petition. Convention Art. 2, 11, 18, 19 I.L.M. at 1501–03. The Sixth Circuit, as Colchester cites, has accordingly held that these Convention provisions, and ICARA's implementation of them, exempt Hague proceedings from the general rule that litigants are entitled to adequate discovery before a court may render summary judgment. *See March v. Levine*, 249 F.3d 462, 474 (6th Cir. 2001). Colchester also points to a Tenth Circuit case for the proposition that neither the

1, 2001) ECF 83 (granting petitioner's motion for examination of a minor child).

Convention nor ICARA provides for court-ordered psychological examinations, even where respondents assert a grave risk defense. *See West v. Dobrev*, 735 F.3d 921, 931–32 (10th Cir. 2013).

But Colchester overstates the holdings of these cases. The Sixth Circuit decision in *March* does not suggest an evidentiary record is unnecessary in Hague proceedings: Rather, the Sixth Circuit held that the district court had not abused its discretion in granting summary judgment before discovery substantially because the district court had "allowed a voluminous amount of evidence into the record in conjunction with the parties' briefs, and the court had independently sought information under the terms of the treaty" before granting summary judgment. 249 F.3d at 468, 475.

Likewise, the Tenth Circuit decision in *West* does not suggest a district court may deny a psychological examination where there are credible allegations of child abuse or domestic violence. The respondent father in *West* sought appointment of a second psychologist to determine if the petitioning mother had abused their children by proffering a Belgian psychologist's letter, which stated only that the mother had little time for the children, had spanked them for discipline, and had failed to provide adequate hygienic and medical care. 735 F.3d at 927. But the respondent not only failed to proffer any evidence of domestic violence or child abuse "sufficient to warrant further inquiry," *id.* at 931, he also refused the district court's invitation to have the Belgian psychologist testify, citing privilege concerns, "[m]uch to the district court's befuddlement," and "was reluctant to permit the court to interview the children, ages eight and six at the time." *Id.* at 927, 931. This led the district court to surmise that

"[a]pparently you don't want me to hear from the children." *Id.* at 928. The Tenth Circuit therefore concluded that "what Respondent really wanted was more time to investigate to determine if there has been abuse, and if so, what kind" and so "refuse[d] to condone what appear[ed] . . . under the totality of the facts presented [to be] a 'fishing expedition' on the part of Respondent designed to 'hook' an Article 13(b) defense." *Id.* at 931–32.

## B.  Standard of Review

"A district court is vested with broad discretion to permit or deny discovery," a decision we review for abuse of discretion. *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). A district court commits an abuse of discretion if it failed to apply the correct legal rule or, if the correct legal rule was applied, if the court's decision "resulted from a factual finding that was illogical, implausible, or without support in inferences that may be drawn from the facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009) (en banc). But here, Lazaro bears a heavier burden: "a decision to deny discovery will not be disturbed except upon the clearest showing that the denial of discovery results in actual and substantial prejudice to the complaining litigant. Prejudice is established if there is a reasonable probability that the outcome would have been different had discovery been allowed." *Laub*, 342 F.3d at 1093.

However, abuse of discretion review requires that the appellate court "be able to ascertain how the district court exercised its discretion." *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1015 (9th Cir. 2010) (reversing and remanding unreasoned, discretionary denial of liquidated damages). "If on appeal the record is devoid of reasoning after an appropriate objection is registered, the case must be

remanded to the district court to record its reasoning in a manner sufficient to permit the 'proper application of the abuse of discretion standard on appellate review.'" *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1225 (9th Cir. 1998) (en banc).

## C.  Analysis

As a threshold matter, the parties dispute whether the district court provided a reasoned decision when it denied Lazaro's application for a psychological examination of S.L.C. The application was denied at the January 27, 2020 status conference, which followed a joint status update, a memorandum from Lazaro, and argument by counsel. Lazaro requested limited discovery of documents related to Colchester's businesses, recovery of Lazaro's electronic devices in Colchester's possession, a psychological exam of S.L.C., and a schedule that would have led to a trial in May 2021. Lazaro's counsel pointed out that discovery could not have commenced before the Rule 26(f) conference absent an agreement between the parties, which Colchester had refused. Colchester, who had only recently asked the court to adopt an expedited schedule (two weeks after Lazaro's counsel requested a proposed timeline and eight weeks after the court set its initial, slower schedule), sought to bar all discovery and have trial start February 8, 2021.

Colchester argued that Lazaro was only seeking delay, that another exam could be harmful to S.L.C., that the Spanish and Washington courts had heard and rejected her allegations, and that she should have conducted discovery earlier. After asking whether S.L.C. had been assessed by a psychologist in Spain, whether the Spanish court had considered Lazaro's arguments, whether there is "any reason to believe that the Spanish courts can't be trusted," and why Lazaro was not present at the status conference, the Court

stated simply that "[w]e're going to have no more discovery."

Colchester contends on appeal that the district court's questioning should be construed as providing a rationale for decision to reject Lazaro's "duplicitous" requests. He also defends the court's denial of the psychological exam by arguing that Lazaro already had a psychologist of her choosing (Dr. Romero) examine S.L.C. in spring 2020, that Lazaro should have worked with Dr. Romero in the intervening months to complete the examination, that the district court ultimately permitted Dr. Romero to testify, and that the issue ultimately reduced to Lazaro's counsel's preference to "shop around for" a psychologist of their preference.

But in fact, the district court's brief remarks were just one-sentence questions during argument, and when the court announced its decision, it provided no reasons. Indeed, it impliedly misstated the record, by saying that "[w]e're going to have no *more* discovery" when no discovery at all had yet taken place in this action. The transcript reflects no discussion of whether the parties could conduct limited discovery before an expedited trial, whether Lazaro's proposed expert could conduct a psychological examination in the time allotted, or whether Colchester was entitled to his delayed request for expedition. We therefore hold that the district court's wholesale denial of discovery in general and of the psychological examination in particular was unreasonable. This alone would suffice for remand. *See Gov't Emps. Ins. Co.*, 133 F.3d at 1225.

Moreover, even if we were to infer from the court's colloquy with Lazaro's counsel that it viewed the request as a request for a *second* psychological exam, since Dr. Romero was available to testify, and that the abuse allegations had

been adequately tested (and rejected) in the Spanish and Washington state courts, we would still conclude on the merits that the district court abused its discretion by denying an in-depth psychological exam in the face of specific, corroborated allegations of domestic violence and child abuse.

In particular, it would have been unfair for the district court to first refuse the exam because Dr. Romero had already examined S.L.C. but later conclude that Dr. Romero's examination was too brief to be reliable and that her testimony should never have been admitted because her opinion was based on an inadequate examination. Together, these rulings rendered the bench trial fundamentally unfair. It is impossible to know, reviewing the record, whether Colchester in fact abused Lazaro and S.L.C. But the district court prevented Lazaro from developing the expert evidence that courts generally require respondents to present for an Article 13(b) defense based on domestic violence to be accepted. This error was further compounded by the district court's peremptory refusal to permit S.L.C. to testify herself. In effect, the district court's rulings made it practically impossible for Lazaro to make out her case.

Finally, the district court's abuse of discretion in denying Lazaro's application for a meaningful psychological examination of S.L.C. resulted in actual and substantial prejudice to Lazaro, since there is a reasonable probability that ordering the exam would have changed the result at trial. *See Laub*, 342 F.3d at 1093. The court's denial of that examination therefore constitutes reversible error.

## II.  The Findings of Fact

Rule 52(a) requires that after a bench trial a district court "find the facts specially and state its conclusions of law

separately." Fed. R. Civ. P. 52(a)(1). This Court has "held that Rule 52(a) requires the district court's findings to 'be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision.'" *Zivkovic*, 302 F.3d at 1090 (quoting *Alpha Distrib. Co. v. Jack Daniel Distillery*, 454 F.2d 442, 453 (9th Cir.1972)). Rule 52(a) does not require the district court "to base its findings on each and every fact presented at trial." *Simeonoff v. Hiner*, 249 F.3d 883, 891 (9th Cir. 2001). But failure to make factual findings "where a full understanding of the issues can[not] be reached without the aid of findings" precludes our review of the district court's legal conclusions and requires that us to vacate and remand the district court's judgment. *Alpha Distributing Co.*, 454 F.2d at 453; *Zivkovic*, 302 F.3d at 1091.

Lazaro argues that the district court failed to make adequate findings of fact regarding the evidence of Colchester's alleged abuse and drug trafficking. We agree. The order below states that "Lazaro failed to meet her burden to establish a grave risk of harm," but that is just a legal conclusion. *See Khan*, 680 F.3d at 786 (holding that the statement that the mother had failed to meet her burden of proof was "not a finding of fact, but a conclusion of law"). The only relevant findings of fact are those in ¶ 10 of Colchester's proposed findings, which the district court incorporated by reference. But ¶ 10 does not expressly address *any* of the relevant testimony or other evidence presented at the bench trial below. Rather, ¶ 10 exclusively addresses the prior decisions of Spanish and Washington state courts, describing Lazaro's disregard for judicial process apparently as suggestive of her unreliability, stating that "[m]any of the allegations of domestic violence and 'drug trafficking' that Ms. Lazaro has raised to attempt to

use this 'grave risk' exception to the Convention were raised and rejected during the previous" proceedings.[13]

We have previously explained that verbatim adoption of a prevailing party's proposed findings . . . is generally disapproved." *FTC v. Enforma Natural Prod., Inc.*, 362 F.3d 1204, 1215 (9th Cir. 2004). And here, the statements incorporated by reference do not provide an adequate factual basis for the district court's rejection of Lazaro's "grave risk" defense. Stating that other state and foreign courts had rejected substantially similar allegations in other proceedings does not resolve the difficult questions of credibility, relevance, and weight that are presented by the

---

[13] Lazaro argues that the district court erred by extending comity to the January 2021 Spanish court order and by "deferring" to the two decisions of Washington state courts dismissing Lazaro's petitions for DVOPs. But the district court neither extended comity to the Spanish decision nor deferred to the Washington state proceedings. We have explained that a district court may extend comity in the Hague Convention context in order (1) "to abstain from hearing a case in favor of a foreign proceeding," (2) "to enforce a foreign judgment," or (3) "to accept the adjudication of a foreign tribunal on a cause of action or a particular issue." *Avesta v. Petroutsas*, 580 F.3d 1000, 1009–10 (9th Cir. 2009). The district court obviously did not abstain from hearing the case or enforce a foreign judgment. And the order below nowhere deferred to the Spanish court, either with respect to the factual question of whether the abuse occurred or to the legal question of whether Lazaro had established an Article 13(b) defense. The district court therefore did not extend comity to Spain in its analysis of the grave risk defense. Nor did the district court defer to the state DVOP proceedings. The order below discusses the state court proceedings as relevant to assessing Lazaro's allegations, but the order never indicates that the court is deferring to them, either explicitly or implicitly. Nor are the state cases treated as preclusive. *Cf. Holder I*, 305 F.3d at 864–66 (holding that ICARA's full faith and credit clause, 22 U.S.C. § 9003(g), prohibits courts hearing Hague petitions from according preclusive effect to state court judgments that did not arise under the Convention).

evidence Lazaro presented in *this* proceeding tending to show that Colchester abused her and abused S.L.C. Furthermore, ¶ 10 speaks only of similar "allegations" presented in those other proceedings, but it does not indicate the extent to which the evidence was overlapping. To the extent Colchester's briefs fill in these blanks, "these contentions are post-hoc rationalizations of the district court decision—rather than an accurate representation of the district court's express findings and conclusions." *C.L. v. Del Amo Hospital, Inc.*, 992 F.3d 901 (9th Cir. 2021). As Judge Richard A. Posner explained regarding another district court's rejection of an Article 13(b) defense:

> [T]he [Rule 52(1)] duty is not waived— indeed it is at its most exacting—when as in this case plaintiff and defendant testify inconsistently and it is impossible to demonstrate by objective evidence which one is telling the truth, or more of the truth. The trier of fact must decide whom to believe (and how much to believe) on the basis of the coherence and plausibility of the contestants' testimony, corroboration or contradiction by other witnesses, and other clues to falsity and veracity. The process of factfinding in such a situation is inexact and the findings that result are doubtless often mistaken. But the judge can't just throw up his hands, as happened in this case, because he can't figure out what is true and what is false in the testimony.

*Khan*, 680 F.3d at 785. Indeed, as Lazaro's counsel stressed at argument, the district court made no express credibility determinations as to either Lazaro or Colchester.

Reversal is therefore warranted here because, "[a]s a consequence [of the omitted findings], we have no way of knowing whether the district court's decision in favor of [Colchester] on [Lazaro's Article 13(b) defense] was based on resolution of the determinative facts in [his] favor; or whether the court erroneously concluded that [the alleged abuse] could, under no circumstances have . . . implications" for Lazaro's grave risk claim.[14] *Alpha Distributing Co.*, 454 F.2d at 453. Accordingly, reversal and remand would be required, even if the court's erroneous denial of Lazaro's application for a psychological exam of S.L.C. did not call for a new trial.[15]

## CONCLUSION

The Hague Convention and ICARA demand that district courts expeditiously adjudicate petitions for return of children alleged to have been wrongfully removed or retained, and district courts are accordingly vested with broad discretion to fashion appropriate procedures in these cases. But courts should not allow haste to overwhelm a respondent's right to develop the psychological evidence needed to make out a viable Article 13(b) defense where she has alleged with considerable particularity that the petitioner has engaged in domestic violence. Accordingly, we hold that the district court abused its discretion by denying Lazaro's application for a psychological examination of S.L.C. in the

---

[14] Lazaro also presented evidence that Colchester was a trafficker in marijuana, but the district court repeatedly questioned whether the drug trafficking allegations could have any relevance whatsoever to Lazaro's "grave risk" defense. We need not reach this issue.

[15] If failure to comply with Rule 52(a) were the only error, we might have simply ordered the district court on remand to amplify its findings. But the combination of errors makes a new trial necessary.

face of her specific allegations that Colchester had engaged in spousal and child abuse. We further hold that the district court failed to comply with Fed. R. Civ. P. 52(a), because the order below did not resolve the factual disputes necessary to support its legal conclusions.

Because these errors rendered the trial below fundamentally unfair, we vacate the district court's order returning S.L.C. to Spain under certain conditions and awarding attorneys' fees to Colchester. This case is remanded for appointment of a psychologist and a new trial on Colchester's petition.[16] But we stress that "[t]he rulings in this opinion are procedural," so we "do not prejudge the merits of the Article 13(b) defense," which has a high burden of proof. *Khan*, 680 F.3d at 788. We also leave it to the district court to determine where S.L.C. shall reside while these proceedings remain ongoing.

**VACATED and REMANDED.**

---

[16] We also leave to the district court's discretion whether and to what extent any additional discovery should be permitted.